IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 7:21-cr-00028 |
| v. ) | |
| ) | By: Michael F. Urbanski |
| MARCUS VERNELL CLARK, JR. ) | Chief United States District Judge |
| ) | |
| ) | |

**MEMORANDUM OPINION**

Marcus Vernell Clark, Jr. ("Clark") was indicted on August 26, 2021, for possessing a firearm knowing that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Indictment, ECF No. 17. Clark's charge arises from a traffic stop in the city of Roanoke on August 11, 2021, at which time a handgun was found in the car he was driving. Clark challenges the constitutionality of the traffic stop, arguing that the stop was prolonged in violation of the Fourth Amendment. Mot. to Suppress, ECF No. 55. The court has reviewed the police body camera footage of the traffic stop, conducted an evidentiary hearing, and reviewed the extensive briefing on the suppression issue. The evidence establishes that the traffic stop was unnecessarily prolonged to allow a K-9 unit to arrive in violation of the Fourth Amendment. Accordingly, the motion to suppress the evidence obtained in the search following the K-9 alert must be **GRANTED**.

**I.**

On August 11, 2021, Roanoke City Police Officer Gardner conducted a traffic stop on a vehicle driven by Clark after investigators with the Roanoke Valley Regional Drug Unit

1

(RVRDU), who had been surveilling Clark for at least an hour, informed Officer Gardner that Clark was driving without a license. See Complaint, ECF No. 1, at 2; H'rg Tr., ECF No. 64, at 6–7. Officer Gardner pulled Clark over and informed him that he could not drive without a license. Gardner Body Camera Footage ("G.B.C.F.") at 2:20. Officer Gardner then asked Clark to get out of the vehicle and patted him down. Id. at 2:46. Clark told Officer Gardner that he wanted to call his (Clark's) grandmother because the car belonged to her, but Officer Gardner did not allow him to do so. Id. at 3:25.

After questioning Clark for another two minutes, Officer Gardner returned to his police vehicle to write up the summons. Id. at 5:28. Officer Gardner spoke to his supervisor on the phone and relayed that he (Officer Gardner) got Clark out of the car, and that Clark was speaking to Officer Landes while he (Officer Gardner) worked on a summons. Id. at 7:03. Officer Gardner then said, "I'm assuming the K-9 is coming?" Id. at 7:10. Officer Gardner called over Officer Michel, another officer on the scene, and handed the phone to her. Id. at 7:40; 8:20. Next, Officer Gardner got back in his vehicle and sat for several minutes while fiddling and clicking his pen. Id. at 8:25–12:20. Officer Michel walked back over to Officer Gardner's vehicle and told him that their supervisor said to "just hold off," "talk to him," and to "just wait for the K-9, he's on the way." Officer Gardner responded, "OK." Id. at 13:04–13:32. After Officer Michel walked away, Officer Gardner radioed an inquiry about whether they had the K-9's ETA, and the person on the other end responded, "negative." Id. at 14:35. Officer Gardner then radioed someone else and asked, "do we have an ETA on K-9?" Id. at 14:57. The person on the other end responded, "five minutes out." Id. at 15:03. Officer Gardner then worked on the summons. Id. at 15:12–17:22. Shortly thereafter, the K-9 officer

arrived, walked up to Officer Gardner's car, and Officer Gardner informed him that Clark denied consent to search the vehicle. Id. at 18:25–18:40. Officer Gardner got out of his vehicle and again asked Clark for consent to search his vehicle, which Clark did not provide. Id. at 19:40-52. After that, Officer Gardner got back in his vehicle and continued to write, and then the K-9 alerted. Id. at 20:09–20:35.

A subsequent search of Clark's vehicle revealed a Glock, model 23, .40 caliber pistol and two Virginia Uniform Summons issued to Clark for traffic violations in the center console. Complaint, ECF No. 1, at 2. The officers put Clark in investigative detention in the back of a Roanoke Police Department ("RPD") patrol car. Id. While he was in the car, he made a phone call to an unknown woman and said "Man, they pulled me over, man. They got me with this f***ing gun dude." Id. The officers transported Clark to Roanoke City Jail and advised him of his Miranda rights. Id. Clark said the gun belonged to his grandmother and he didn't know it was in the car. Id. Court records showed that Clark had been convicted of a felony and that his firearm rights had not been restored. Id. at 4.

## II.

"In deciding a motion to suppress, the district court is empowered to make findings of fact, and conclusions of law." United States v. Adkinson, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citing United States v. Stevenson, 396 F.3d 538, 541 (4th Cir. 2005)). "At a hearing on a motion to suppress, the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." United States v. McKneely, 6 F.3d 1447, 1452–53 (10th Cir. 1993). "The defendant bears the burden of proving that he has a reasonable

expectation of privacy. If the defendant does have such an expectation, then the court must determine the reasonableness of the search and seizure." United States v. Rusher, 966 F.2d 868, 874 (4th Cir. 1992) (internal citation omitted). "Once the defendant establishes a basis for his suppression motion, the burden shifts to the government." Adkinson, 191 F. Supp. 3d at 568 (citing United States v. Matlock, 415 U.S. 164, 177–78 & n.14 (1974)).

### III.

In support of his Motion to Suppress, Clark argues that he had a reasonable expectation of privacy in the interior of the vehicle and that the officers detained him for an extended period of time without a warrant and without probable cause or reasonable suspicion to believe that the car contained contraband or evidence of a crime. Mot. to Suppress, ECF No. 55, at 1. He denied the officers' request that he consent to the search and argues that their detention of him outside the car was a warrantless seizure in violation of the Fourth Amendment. Id. at 2. Further, Clark argues that even if the initial stop and detention were constitutional, the officers' subsequent conduct violated the Fourth Amendment because they detained him "for an extended, unreasonable period" while they waited for the K-9 to arrive. Id. Clark argues that the traffic stop was prolonged longer than necessary to complete the tasks tied to the traffic infraction. Id.

In response, the government argues that the police requested that the K-9 come to the scene because they were concerned that there was contraband or evidence of a crime in the vehicle. Resp. Opp. Mot. to Suppress, ECF No. 57, at 1. The government avers that the K-9 arrived about 16 minutes after the start of the traffic stop and Officer Gardner spent about 13 minutes in his car working on the summons. Id. at 1–2.

4

The government also argues that the timing of the stop is immaterial because Clark did not have a valid driver's license, rendering him unable to lawfully drive the car from the scene. The government argues:

> [W]hether it took one minute, or 10 minutes, or 100 minutes for Officer Gardner to issue Mr. Clark's summons, Mr. Clark was leaving the scene on foot. But his car, and the firearm within it, were going nowhere. The dog sniff of the car would inevitably have occurred whether Mr. Clark was still on scene or not; his presence or absence would have had no bearing on the ultimate and inevitable discovery of the gun.

Id. at 2–3. The government additionally argues that because Clark had previously been convicted in Roanoke City General District Court of driving without a license, the officers had the authority to impound the vehicle, which would have required an inventory search, leading to the inevitable discovery of the firearm. Id.

An evidentiary hearing was held on the motion to suppress on February 3, 2022, at which Officer Gardner testified and the body camera footage was received in evidence. Clark sought leave of court to brief the inevitable discovery issue, which was granted, and the parties filed additional briefs.

Clark argues that traffic stops initially supported by reasonable suspicion of a traffic violation become unlawful if prolonged beyond the point where a summons should have been issued. Memo. in Supp. of Mot. to Suppress, ECF No. 70, at 2. Clark emphasizes that there is no *de minimus* exception to the rule that officers cannot prolong a traffic stop to complete a K-9 sniff. Id. (citing Rodriguez v. United States, 575 U.S. 348, 348 (2015)), and contends that the officers prolonged the stop to wait for the K-9, and thus flagrantly violated the Fourth Amendment. Id. at 4.

Clark asserts that because the officers' Fourth Amendment violation was flagrant, the

inevitable discovery doctrine is inapplicable. Id. at 8. He argues that the initial stop was unlawful, and that without the unlawful stop, the K-9 would not have had the chance to perform a free air sniff. Id. Clark asserts that exceptions to the exclusionary rule are not applicable when law enforcement commits a purposeful or flagrant Fourth Amendment violation because "[t]he exclusionary rule exists to deter police misconduct." Id. at 9 (citing Utah v. Strieff, 579 U.S. 232, 241 (2016)). He emphasizes that exclusion of the evidence is needed to deter similar police misconduct in the future. Id. at 10.

The government responds that Clark cannot assert a privacy interest in the exterior of his car because a K-9 sniff of its exterior is not a search under the Fourth Amendment. Second Resp. Opp. Mot. to Suppress, ECF No. 71, at 1 (citing United States v. Place, 462 U.S. 696, 707 (1983); Illinois v. Caballes, 543 U.S. 405, 405 (2005)). Citing United States v. Perez, 30 F. 4th 369, 371 (4th Cir. 2022), the government contends that "[n]o matter what the police did or failed to do, Mr. Clark could not lawfully drive his car from the scene of the stop." Id. at 2. The government also asserts that a lawful stop does not become unlawful when there is a Fourth Amendment violation—the evidence found as a result of the improper extension is simply suppressed. Id. at 3–4. The government also argues that the Strieff test, which examines the attenuation between unconstitutional conduct and discovery of evidence, 579 U.S. at 239, is inapplicable because this is not an attenuation case, and that even if Clark was detained without the necessary level of cause, it was not flagrant misconduct. Id. at 5.

### A. Unreasonable Search and Seizure

In determining whether the traffic stop violated Clark's Fourth Amendment right to be free from unreasonable seizure, U.S. Const. amend. IV, a number of recent decisions from

the Supreme Court and the Fourth Circuit are instructive.

In Rodriguez v. United States, 575 U.S. 348 (2015), an officer pulled Rodriguez over for unlawfully driving on a highway shoulder. Id. at 348. The officer asked the driver why he was driving on the shoulder, collected his driver's license, registration, and proof of insurance, and ran records on the driver. Id. at 351–52. The officer returned to the vehicle, asked the passenger for his driver's license, and questioned him about his travel itinerary. Id. The officer then ran records on the passenger and called for a second officer. Id. He wrote a "warning ticket" for the driver, returned to the vehicle, explained the warning ticket to the driver. Id. After the officer completed everything related to the traffic stop, he asked Rodriguez for permission to walk his K-9 around Rodriguez's car. Id. Rodriguez refused consent, so the officer detained him until a second officer arrived, then the officer retrieved his K-9 and walked it around the vehicle. Id. The K-9 alerted, and the officer found methamphetamine when he subsequently searched the car. Id.

The Court began by reiterating that a traffic stop is "more analogous to a so-called 'Terry stop' than . . . than to a formal arrest." Id. at 354 (citing Knowles v. Iowa, 525 U.S. 113, 117 (1998)). As with a Terry stop, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." Id. (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)). An officer's mission includes making "ordinary inquiries incident to [the traffic] stop." Id. at 355 (citing Caballes, 543 U.S. at 408). These inquiries can include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. (internal

7

citations omitted). Once an officer has, or "reasonably should have," completed the "tasks" required to address the traffic violation, the stop must end and the officer "must allow the seized person to depart. . . ." Id. at 353–54 (citing United States v. Sharpe, 470 U.S. 675, 686 (1985)). A dog sniff is not an ordinary incident of a traffic infraction stop because it is meant to detect evidence of criminal behavior—not to ensure that cars on the road are operated safely and responsibly. Id. at 355–56.

The Court explained that to permissibly extend a stop that is completed or should have been completed, police officers must have reasonable suspicion of criminal wrongdoing beyond that of the initial traffic violation. See id. at 353–54. Absent reasonable suspicion, a traffic stop that exceeds the time needed to handle the initial infraction violates the Constitution's prohibition on unreasonable seizures. Id. at 350. Therefore, if waiting for a K-9 to arrive to perform a sniff extends the time of a stop for a traffic infraction, it is unconstitutional. See id.

Since the Court's decision in Rodriguez, the Fourth Circuit has considered the decision's application in several cases. In United States v. Hill, 852 F.3d 377, 384 (4th Cir. 2017), the court provided an example of a traffic stop that fell within the bounds of Rodriguez. Officer Taylor and Officer McClendon pulled over Jeremy Taylor (the driver) and Donald Hill for speeding and crossing a yellow double-solid line marker. Id. at 379. Officer Taylor entered their information into the National Crime Information Center (NCIC) database, and it returned an alert "that both men had been associated with drug trafficking and were 'likely armed.'" Id. at 380. Jeremy Taylor also had a suspended driver's license. Id. Officer Taylor began to write two summonses for Jeremy Taylor for reckless driving and driving with a

8

suspended license, and Officer Taylor requested that a K-9 unit be sent to the scene. Id. Officer Taylor also entered the names of Jeremy Taylor and Hill into another database, known as "PISTOL," and spent three to five minutes reviewing the information it returned. Id. Officer McClendon remained with the vehicle and asked the men if there were any drugs or firearms in the car, and after Officer McClendon's third time asking, Hill said he had a firearm on his person. Id. Officer McClendon shouted "gun," so Officer Taylor returned to the car to help secure Hill and recover the gun. Id. During this time, the K-9 unit arrived. Id. Hill moved to suppress the firearm and the statements he made during the stop, but the district court held that the stop was not impermissibly extended and denied the motion. Id.

The Fourth Circuit agreed with the district court and found that the record did not contain evidence that either officer delayed completion of the traffic stop. Id. at 382. It also found that none of the officers' actions showed a lack of diligence or were unreasonable. Id. at 383. The Fourth Circuit emphasized that Hill was not a case where the officers decided "to execute a traffic stop in a deliberately slow or inefficient manner, in order to expand a criminal investigation within the temporal confines of the stop without reasonable suspicion of criminal activity or consent of those detained." Id. at 384. It found that "[i]n such a case, an officer's actions delaying the completion of the stop may compel a different conclusion than the one we reach here." Id.

In contrast, in United States v. Bowman, 884 F.3d 200 (4th Cir. 2018), the Fourth Circuit vacated the district court's refusal to suppress evidence seized as a result of a K-9 sniff performed after a traffic stop had been completed. In Bowman, North Carolina Highway Patrol Trooper Waycaster stopped Bowman after seeing him drive over a fog line and exceed

9

the speed limit.[1] Id. at 205. After speaking with Bowman and checking his driver's license and vehicle registration, Trooper Waycaster issued Bowman a warning for speeding and unsafe movement of the vehicle. Id. at 206. "Waycaster then completed the traffic stop by returning Bowman's driver's license and registration and shaking his hand." Id. After briefly extending the stop consensually by questioning Bowman, Trooper Waycaster told Bowman, seated in the patrol car, to "hang tight" and proceeded to question Alvarez, Bowman's passenger. Id. at 207. After questioning Alvarez, Trooper Waycaster asked for permission to search the car, which Bowman refused. Id. Trooper Waycaster again told Bowman to "hang tight," placed Alvarez in the patrol car with Bowman, and summoned a K-9 officer whose dog alerted for the presence of narcotics. Id. While the district court found that the prolonged traffic stop was supported by reasonable suspicion of independent criminal activity, the Fourth Circuit disagreed. Accordingly, the court concluded that because "Trooper Waycaster lacked reasonable suspicion to extend an otherwise-completed traffic stop," id. at 219, the stop was unlawfully prolonged because it continued beyond the time necessary to "complet[e] all tasks related to the traffic infraction[s] and asking Bowman a few additional questions," id. at 213 (citing United States v. Palmer, 820 F.3d 640, 649–50 (4th Cir. 2016)). This "exten[sion] of an otherwise-completed traffic stop" was outside the bounds of what Rodriguez permits.

Most recently, in United States v. Perez, the Fourth Circuit addressed the following facts. Officer Marcel pulled Perez over after receiving information that the car Perez was driving had an expired registration tag and learning from a confidential informant that Perez

---

[1] While Trooper Waycaster had received a tip from the Drug Enforcement Administration ("DEA") about the vehicle Bowman was driving, the government agreed that the DEA tip ought not be considered in the court's legal analysis.

and a woman were selling large quantities of heroin and methamphetamine.² 30 F. 4th at 371. Officer Marcel suspected that Perez's vehicle had a fake registration tag because it was issued by the same company that issued another fake tag Officer Marcel had seen during a different investigation. Id. at 371–72. The officers on the scene discovered that Perez's license also was not "good." Id. Before Officer Marcel stopped Perez, another officer had called a K-9 unit. Id. Detective Haigler asked Perez to exit the car, and then other officers collected the Vehicle Identification Number ("VIN") at about 11 minutes and 50 seconds into the stop. Id. Officer Marcel learned that the car was not registered to Perez and that the true tag had not yet expired. Id. About 15 minutes into the stop, Officer Marcel asked another officer to retrieve the car's registration, and within 30 seconds after that, the K-9 unit arrived. Id. The K-9 alerted twice, and the officers then searched the car and found methamphetamine and firearms. Id. at 372–73. Officer Marcel cited Perez for operating a vehicle with a revoked driver's license and operating a car with an altered registration plate, and the officers arrested Perez and arranged for the car to be towed. Id.

The district court in Perez held that the stop wasn't prolonged because the officers were investigating multiple infractions, Officer Marcel was "methodical" in his investigation, and Officer Marcel's testimony was credible. Id. at 373. Specifically, the district court credited Officer Marcel's testimony that any delay was due to him not being a good multi-tasker, experiencing internet connectivity issues, and waiting to record the VIN for safety reasons. Id. at 374. The court also noted that since the car would have been towed due to the fictitious tag,

---

² However, "the government stipulated that the sole purpose of the stop was to investigate the traffic infractions rather than suspected narcotics activity." Id. (citing J.A. 44).

11

the time that would have taken would have exceeded the length of the K-9 sniff. Id. The Fourth Circuit agreed with the district court and affirmed its holding. Id. at 377. The Fourth Circuit held that the traffic stop was not impermissibly prolonged, concluding as follows:

> [N]ot only had officers not finished investigating the multiple infractions by the time the canine unit arrived, they also hadn't issued Perez citations for the infractions.
>
> And once the officers confirmed that the vehicle's plate was fictitious and that Perez's license was revoked, Perez couldn't simply drive away even if the citations had been issued. The officers testified that they called for the car to be towed, and it hadn't been by the time the dog sniff occurred.
>
> In sum, though the stop could have been shorter (and begun more efficiently), it wasn't impermissibly prolonged. Marcel and Haigler's actions were reasonably related to investigating an expired license plate.

30 F. 4th at 376.

In light of Rodriguez and subsequent Fourth Circuit precedent, the court concludes that while the initial stop in this case was lawful, it was impermissibly prolonged to allow the K-9 unit to arrive and perform the sniff. To issue a summons, Officer Gardner had to run Clark's vehicle through the DMV to get the information he needed, which he explained typically takes less than a minute. Hr'g Tr., ECF 64, at 12. During the evidentiary hearing, Officer Gardner indicated that at 9:23 of his body camera recording, he had all the information he needed to complete the summons, and from that point it was just a matter of filling out the form. Id. at 13. However, based on the body camera footage, he did not finish writing the summons until about 20:35. G.B.C.F. at 20:35. Officer Gardner testified that he finished around the time the K-9 arrived, but did not recall the exact time. H'rg Tr., ECF No. 64, at 18–19. The police body camera footage makes it clear that during that time, Officer Gardner's supervisor instructed him to "just hold off" and "just wait for the K-9, he's on the way" before

12

completing the traffic stop. G.B.C.F. at 13:04–13:32. This runs contrary to the Supreme Court ruling in Rodriguez that "a police stop exceeding the time needed to handle the matter for which the stop was made, violates the Constitution's shield against unreasonable seizures." Rodriguez, 575 U.S. at 350.

The government's arguments to avoid application of Rodriguez are unavailing. Pointing to the Fourth Circuit's ruling in Perez, the government argues that the court should focus on Clark's car rather than his person. The government reasons:

> However, Clark contends that the firearm should be suppressed because the police improperly prolonged his August 11, 2021 traffic stop beyond the time needed to issue him a traffic summons for driving without a license. Even viewing the evidence in the light most favorable to Clark, this is still the most crimson of red herrings. It is at best a collateral issue. No matter what the police did or failed to do, Mr. Clark could not lawfully drive his car from the scene of the stop. And the illegal firearm was in that car. This case is about the Fourth Amendment status of Mr. Clark's car, and nothing else. Regardless of how matters proceeded with the issuance of Mr. Clark's summons, the car, and the gun within it, were not able to leave the scene prior to the arrival of the drug dog.

Second. Resp. Opp. Mot. to Suppress, ECF 71, at 2. The government contends that "[t]he key issue is what happened with the car, not with Mr. Clark." See id. at 4.

While the government correctly points out that the car Clark was driving could not lawfully move in the absence of a licensed driver, the argument overlooks the fact that for Fourth Amendment purposes, the traffic stop seized both the car and Clark. And at the time of the K-9 sniff, Clark was not free to leave—he remained seized. See Hr'g Tr., ECF No. 64, at 25. The seizure of Clark was inextricably connected with the seizure of his vehicle. Because the officers' superiors instructed them to delay the traffic stop until the K-9 unit arrived, the seizure of Clark's person was impermissibly prolonged.

13

Despite the government's reliance on the Fourth Circuit's decision in Perez, that case is not dispositive here. In contrast to Perez, where the officers were taking time to investigate multiple traffic infractions, the delay here was due to the decision to wait for a K-9 unit to arrive. While Officer Gardner testified that he spent the intervening minutes thinking about other things he could write a ticket for, such as a window tint violation, and wondering if he missed anything, H'rg Tr., ECF No. 64, at 24–25, nothing on the recording of the stop suggests that the officers raised any issue about the tint of the windows by measuring them. Id. at 25. Of critical importance to the court's decision in this case is the fact that the officers on the scene were instructed by their superiors to hold off and wait for the K-9 unit to arrive, as confirmed by Officer Gardner's radio inquiries about its status. The fact that the officers were instructed by their superiors to delay the traffic stop to await the drug dog, and did so, distinguishes this case from Perez.

Also, unlike in Perez, the officers here were not waiting for a tow truck to arrive. See Hr'g Tr., ECF No. 64, at 28. In fact, they did not call one. Id. In Perez, the majority noted that Perez "couldn't simply drive away" and that the tow truck the officers called had not arrived by the time the K-9 sniff occurred. Perez, 30 F. 4th at 376. Officer Marcel testified that calling a tow truck was part of his police department's procedures. See id. at 374, n.5. Here, not only did the officers not call a tow truck, but Officer Gardner did not testify that it was departmental procedure to either call and wait for a tow truck or to wait for a licensed driver to pick up the vehicle. In fact, Officer Gardner did not know how the car left the scene, and defense counsel explained that Clark's grandmother picked it up later. See H'rg Tr., ECF No. 64, at 28, 41. Even if it had been departmental procedure to make sure the car left the scene

14

legally, the officers here not only made no attempt to arrange for transportation of the vehicle, but they prevented Clark from calling his grandmother, a licensed driver and the vehicle's owner, so she could drive the car home. See id. at 28. In contrast, in Perez, the officers called a tow truck once they realized that Perez could not drive the car away from the scene. See Perez, 30 F. 4th at 373.

The next question is whether the officers had Clark's consent or reasonable suspicion of criminal activity to prolong the stop. See Rodriguez, 575 U.S. at 353–54. This reasonable suspicion must be that "ordinarily demanded to justify detaining an individual." Id. at 355. While the government argues that "[t]he police were concerned that contraband or evidence of a crime might be contained within Mr. Clark's vehicle, and so requested that a drug detection dog be brought to sniff that vehicle," such unsubstantiated concern does not rise to the level of reasonable articulatable suspicion. Indeed, Officer Gardner testified that he had no reason to stop Clark other than the fact that he had no license. H'rg Tr., ECF No. 64, at 30. Additionally, Clark did not provide consent. G.B.C.F. 18:25–18:40. Therefore, there was no justification to extend the stop to conduct the K-9 sniff.

**B. Inevitable Discovery**

As discussed *supra*, the government argues that even if the stop was conducted in an unlawful manner, the inevitable discovery exception applies to the firearm. See Resp. Opp. Mot. to Suppress, ECF No. 57, at 2–3. The government contends that there are two grounds for applying the inevitable discovery exception. First, because Clark could not drive the car away, even if the officers served him with the summons and allowed him to leave the scene, the car would have had to stay there, and the officers would have conducted the K-9 sniff and

15

received a positive alert after Clark left, upon which they would have searched the car and found the gun. Id. at 3. Second, the government asserts that because Clark was stopped for driving without a license and had previously been convicted of driving without a license, the officers had statutory authority to impound the vehicle under Code of Virginia § 46.2-301.1(iv), and thus would have discovered the gun during an inventory search. Id.

Inevitable discovery is an exception to the exclusionary rule that says that "evidence unlawfully obtained is admissible '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" United States v. Thomas, 955 F.2d 207, 209 (4th Cir. 1992) (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)).

Here, the government cannot prove by a preponderance of the evidence that the gun in the car Clark was driving would have inevitably been discovered using lawful means. The government's argument that the police would have conducted the K-9 sniff even if the officers let Clark leave hinges upon its assertion that the police could lawfully conduct a K-9 sniff on Clark's vehicle because it was stopped on a public street. See Second Resp. Opp. Mot. to Suppress, ECF No. 71, at 6. While that is certainly true, the evidence does not suggest that a search of the vehicle was inevitable. Again, the officers made no effort to tow the vehicle and did not know how it left the scene. Further, had the officers not been instructed to hold off and wait until the K-9 unit arrived, Clark could have called the vehicle's owner, his grandmother, to pick it up. Under these facts, the discovery of the firearm in the car was not inevitable.

Finally, the government cannot establish by a preponderance of the evidence that the

firearm inevitably would have been discovered via an inventory search. The government asserts that because Officer Gardner had the authority under Code of Virginia § 46.2-301.1(iv) to impound Clark's vehicle, and impoundment requires an inventory search, the gun would have been discovered upon impoundment. Resp. Opp. Mot. to Suppress, ECF No. 57, at 3. Unlike in Perez, the officers made no effort to impound Clark's vehicle. H'rg Tr., ECF No. 64, at 28. Instead, at some point, Clark's grandmother picked up the vehicle. Id. at 41. As the officers made no effort to impound the vehicle, it was not inevitable that the gun would have been discovered via an inventory search.

For these reasons, the inevitable discovery exception does not apply.

**IV.**

Because the officers in this case prolonged the traffic stop of Clark to conduct a K-9 sniff without having reasonable suspicion or Clark's consent, and because the inevitable discovery exception does not apply, the court finds a violation of the Fourth Amendment requiring suppression of the evidence obtained during the search following the delayed K-9 sniff. Therefore, Clark's Motion to Suppress is **GRANTED**.

An appropriate order will be entered.

Entered: October 24, 2022

Digitally signed by Michael F. Urbanski  Chief U.S. District Judge
Date: 2022.10.24 12:48:51 -04'00'

Michael F. Urbanski
Chief United States District Judge